**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**MELVIN COCHRAN,**

      **Plaintiff,**

**v.**                                                   **Case No. 2:17-cv-04312**

**DAVID BALLARD; WARDEN JIM
RUBENSTEIN; and LOLITA BUTCHER,**

      **Defendants.**

**PROPOSED FINDINGS OF FACT and RECOMMENDATIONS**

In November 2017, Plaintiff, Melvin Cochran ("Plaintiff"), proceeding *pro se* and incarcerated at the Mount Olive Correctional Complex ("MOCC")  in Mount Olive, West Virginia, filed a complaint pursuant to 42 U.S.C. § 1983 against David Ballard, the Warden of MOCC, and Lolita Butcher and Jim Rubenstein, the Acting West Virginia Division of Corrections ("WVDOC") Commissioner and former WVDOC Commissioner, respectively. In the Complaint, Plaintiff alleges that his constitutional right to marry under the First and Fourteenth Amendments has been violated by Defendants. (ECF No. 1 at 8). Pending before the court is Defendants' Motion for Judgment on the Pleadings. (ECF No. 23). Plaintiff has filed a Response in Opposition to Defendants' Motion, (ECF No. 28), and Defendants have filed a reply memorandum. (ECF No. 30). This matter is assigned to the Honorable Joseph R. Goodwin, United States District Judge, and by standing order is referred to the undersigned United States Magistrate Judge for the submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. §

1

636(b)(1)(B).

Having thoroughly considered the issues in dispute, the undersigned **FINDS** that the complaint, at least in part, states a claim that is sufficient to survive Defendants' initial dispositive motion. Accordingly, the undersigned respectfully **PROPOSES** that the presiding District Judge confirm and accept the following findings and **RECOMMENDS** that Defendants' motion for judgment on the pleadings, (ECF No. 23), be **DENIED,** in part, and **GRANTED**, in part. The motion for judgment on the pleadings should be **DENIED** as to Plaintiff's claims for equitable relief and **GRANTED** as to Plaintiff's claims for monetary damages.

## I.    <u>Relevant Facts and Procedural History</u>

Plaintiff alleges that he has been repeatedly denied authorization to marry Sandra Lawrence, a private citizen. (ECF No. 1 at 8). Plaintiff and Ms. Lawrence met while she was employed as a Chaplain at MOCC. (*Id.*). Plaintiff states that he and Ms. Lawrence developed a "strong spiritual bond" and friendship through their shared beliefs and faith. (*Id.* at 9). Ms. Lawrence later sent Plaintiff a money order for $50, in violation of institutional rules. This led to Ms. Lawrence's termination and Plaintiff's placement in segregation. (*Id.* at 8). Plaintiff and Ms. Lawrence continued their relationship after her termination through correspondence. (*Id.* at 9).

Beginning in 2015 and continuing until early 2016, Ms. Lawrence sought approval for visitation with Plaintiff, but her requests were refused due to a WVDOC policy which states that employees and former employees are not permitted to visit inmates. (ECF Nos. 2-1, 2-3, 2-4, 2-6, 2-7). In February 2016, Ms. Lawrence officially requested permission from Defendant Ballard to marry Plaintiff. (ECF No. 2-8). In March 2016, Defendant Ballard denied Ms. Lawrence's request stating, "[s]ince you do not have the authorization

2

to visit this inmate, your request is moot." (ECF No. 2-9). Plaintiff then sought approval to marry Ms. Lawrence in March 2016 and again in June 2016. (ECF No. 2-25). He was denied permission both times. (*Id.*). Ms. Lawrence renewed her request to marry Plaintiff in a letter to Lolita Butcher in May 2017. (ECF No. 2-12, at 3). In June 2017, Ms. Lawrence's request was also denied. (ECF No. 2-13).

Plaintiff asserts that inmate marriages are governed by WVDOC Policy Directive 507.00 which states in relevant part:

> B.   An inmate's request to marry shall be approved provided:
>
> 1. The inmate is legally eligible to marry.
>
> 2. The intended spouse has verified, in writing, an intention to marry the inmate and is legally eligible to do so.
>
> 3. The marriage poses no threat to institution/facility/center security, good order or public safety.

(ECF No. 1 at 2). Plaintiff alleges that he was told by prison staff that his request to marry Ms. Lawrence was denied due to Operating Procedure 5.13, which mandates that:

> [T]he intended spouse must meet all of the same eligibility criteria requirements applicable to all visitors as outlined in WVDOC Policy Directive 505.03.

(*Id.* at 13). WVDOC Policy Directive 505.03, however, contains the following exclusionary clause that applies to Ms. Lawrence:

> Employees and ex-employees, volunteers and ex-volunteers, are not permitted to visit with inmates.

(*Id.*). Plaintiff contends that, as Policy Directive 507.00 does not contain a requirement that the prospective spouse be approved for visitation, it is improper for Defendants to reject his request to marry Ms. Lawrence based on Operating Procedure 5.13. (*Id.* at 11, 16).

3

Plaintiff argues that Defendants' repeated refusal to grant him authorization to marry Ms. Lawrence violates his fundamental right of marriage guaranteed by the United States Constitution. (ECF No. 1 at 14). He maintains that his marriage to Ms. Lawrence does not create a security threat, and Defendants' actions in withholding permission for their marriage based on "reflexive and rote assertions of security issues" is without justification. (*Id.* at 15-16). Plaintiff notes that the marriage could be accomplished via a one-time visit for the purpose of the ceremony and, thus, would not require extending full visitor privileges to Ms. Lawrence. (*Id.* at 16). For relief, Plaintiff requests that this Court issue a declaratory judgment stating that Defendants have violated Plaintiff's rights under the First and Fourteenth Amendments; issue an injunction ordering Defendants to begin working with Plaintiff to develop a procedure that will allow Plaintiff and Ms. Lawrence to marry while maintaining valid security measures; order an award of compensatory and punitive damages that the Court deems fit and proper; and grant any other relief to which Plaintiff is entitled. (*Id.* at 16-17).

In August 2018, Defendants filed a Motion for Judgment on the Pleadings and a supporting memorandum. (ECF Nos. 23, 24). Defendants agree with Plaintiff that decisions regarding inmate marriage are governed by WVDOC Policy Directive 507.00; however, they deny that the decision is controlled solely by that Policy Directive. (ECF No. 24 at 2-3). Defendants contend that the decision to deny Plaintiff's marriage request pursuant to Operating Procedure 5.13 is constitutional under the test established by the United States Supreme Court in *Turner v. Safley,* 482 U.S. 78 (1987). (ECF No. 24 at 3, 10). Defendants state that allowing Plaintiff to marry Ms. Lawrence would pose a security risk as she is a former prison employee and, consequently, is knowledgeable of prison security procedures. (*Id.* at 8). Moreover, she has a propensity to violate prison policies

as demonstrated by her history of depositing $50.00 in Plaintiff's inmate account in flagrant contravention of prison rules. (ECF No. 24 at 8). Defendants also maintain that the decision to deny Plaintiff's marriage is discretionary and does not violate any clearly established rights; accordingly, they are entitled to qualified immunity against an award of civil damages. (*Id.* at 10-12). Defendants ask this Court to dismiss Plaintiff's Complaint with prejudice. (ECF No. 23 at 1).

On August 28, 2018, the undersigned held a status conference. (ECF No. 26). Following the conference, Plaintiff was ordered to respond to Defendants' Motion for Judgment on the Pleadings and to provide a summary of any specific factual issues that Plaintiff believed needed to be developed prior to a ruling on the motion. (ECF No. 27). In September 2018, Plaintiff filed a Response in Opposition to Defendants' Motion for Judgment on the Pleadings. (ECF No. 28).

In his Response, Plaintiff reiterates his position that it is improper for Defendants to require visitation approval as a precondition of marriage. (*Id.* at 4). Plaintiff challenges the "implementation of informal and unauthorized policies" to deny his right to marry. (*Id.* at 9). Plaintiff restates his position that Policy Directive 507.00 represents the exclusive authority for inmate marriage approval, and that the defendant prison officials have illegally denied his request to marry Ms. Lawrence by establishing an additional requirement that the prospective spouse be an approved visitor. (*Id.* at 10-11).

Plaintiff furthermore disagrees with Defendants' interpretation of *Turner v. Safley,* arguing that Defendants' decision to deny his marriage request does not meet the test established by the Supreme Court in that decision. Plaintiff contends that Defendants' fear of security risks due to Ms. Lawrence's past violation of prison regulations and status as a former employee is "unreasonable" and an "exaggerated response." (ECF No. 28 at

11). Plaintiff refers to other individuals that he believes committed similar infractions as Ms. Lawrence, but were nonetheless permitted to visit the prison afterward. (*Id.* at 13). Plaintiff claims that, in any event, Defendants' security concerns can be alleviated by restricting Ms. Lawrence to a one-time supervised visit solely for the marriage ceremony. (*Id.* at 13-14).

Plaintiff also filed a list of factual issues that he feels need to be developed prior to consideration of a dispositive motion. (ECF No. 29). Most of the factual issues listed by Plaintiff pertain to the process by which prison Policy Directives and Operating Procedures are promulgated, their legal effect, and the discretion afforded to those charged with enforcing them. (*Id.* at 1-2). Plaintiff also asserts that further factual development is needed to investigate whether several former inmates and a former "Kiros" volunteer, who purportedly violated institutional rules, were subsequently granted visitation access.[1] (*Id.* at 2).

In October 2018, Defendants filed a Reply to Plaintiff's Response in Opposition. (ECF No. 30). They first argue that no further discovery is required in order for the case to be adjudicated on the pleadings. (*Id.* at 12). Defendants assert that for the purpose of their Motion for Judgment on the Pleadings, they have accepted as true all the factual allegations contained in Plaintiff's Complaint. (*Id.*). As to Plaintiff's twelve unresolved factual issues, Defendants state that the identified issues are either purely legal questions already answered by the record, or are irrelevant to the merits of the case. (*Id.* at 12-13). Defendants contend that the alleged incidents in which other individuals were authorized

---

[1] Both Plaintiff and Defendants refer to a "Kiros" volunteer. There does not appear to be any organization by that name operating in West Virginia prisons, however, the similarly named "Kairos" Prison Ministry International does have a volunteer presence in West Virginian prisons and likely is the organization to which the parties refer. *See* https://kairoswv.org/team-volunteer/.

to visit the prison after committing infractions do not need to be developed by discovery, because they bear no similarity to Ms. Lawrence's case. According to Defendants, the first two referenced cases involve ex-*inmates*; therefore, they do not implicate the type of security concerns at issue here. Defendants contend that the case of the ex-volunteer is likewise irrelevant, as the ex-volunteer "does not have knowledge of security procedures." (ECF No. 30 at 13). Finally, Defendants argue that past decisions to grant admission to the facility are not material to Plaintiff's case as the determination is "one of discretion." (*Id.*). As "every decision is unique, with no bearing on any subsequent decision," Plaintiff's allegations that similarly situated persons were not considered by the prison to pose a security risk have no bearing on Plaintiff's unique case. (ECF No. 30 at 14).

Defendants then reiterate their position that Plaintiff's Complaint fails to state a viable claim and should be dismissed. First, Defendants note that Plaintiff is incorrect in claiming that Operating Procedure 5.13 improperly adds another criterion to the inmate marriage approval process as outlined by Policy Directive 507.00. (*Id.* at 4-5). Defendants state that in its third requirement, Policy Directive 507.00 delegates the determination of what constitutes a threat to institutional security, good order, or public safety to the Warden of the prison. (*Id.*). They argue that in creating Operating Procedure 5.13, Defendant Ballard was determining, within his discretion, that when an intended spouse is unable to meet the visitation requirements of 505.03, he or she necessarily poses a threat to institutional security, good order, or public safety. (*Id.*). Thus, Operating Procedure 5.13 merely represents the implementation of Policy Directive 507.00, and not an improper additional requirement. (*Id.*). Defendants emphasize that they are simply executing a constitutional policy and making a determination that is within their discretion. As such, they are entitled to qualified immunity and the case should be

dismissed on the pleadings as a matter of law. (*Id.* at 4-5).

Defendants also argue that Plaintiff fails to assert a viable constitutional claim on the merits. They point out that incarcerated individuals have no recognized constitutional right to visitation. (ECF No. 30 at 8). As Plaintiff's request for marriage necessarily requires visitation, he fails to state a claim. Put simply, because Plaintiff has no constitutional right to *any* visitation, he certainly has no right to special visitation for the purpose of marriage. (*Id.* at 8-9). Defendants reason that the Supreme Court's decision in *Butler v. Wilson* supports their argument. *Id.*, 415 U.S. 953 (1974). (ECF No. 30 at 11). Defendants renew their request for dismissal of Plaintiff's Complaint for failure to state a viable claim under Federal Rule of Civil Procedure 12(c).[2]

## II.    <u>Standard of Review</u>

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed-but early enough not to delay trial-a party may move for judgment on the pleadings." A motion for judgment on the pleadings pursuant to Rule 12(c) is analyzed under the same standard as a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss. *See Burbach Broad. Co. of Del. v. Elkins Radio Corp.*, 278 F.3d 401, 405–06 (4th Cir. 2002). A motion under Rule 12(b)(6) tests the sufficiency of the complaint to state a claim. Accordingly, the Court will assume that the facts alleged in the Complaint are true and will draw all reasonable inferences in Plaintiff's favor as the nonmoving party. *Burbach*, 278 F.3d at 405–06. The purpose of Rule 12(b)(6) "is to test the sufficiency of a complaint

---

[2] While it is not entirely clear from Plaintiff's pleadings whether he is asserting a "facial" or "as applied" challenge to the constitutionality of the prison's marriage policy and procedure, the bulk of the arguments made by both parties focus on the unconstitutionality of the marriage restriction specifically imposed in Plaintiff's case. (ECF No. 28 at 12-16; ECF No. 30 at 6-14). Accordingly, for the purpose of Defendants' Rule 12(c) motion, Plaintiff's claim is best understood as an "as applied" challenge to the denial of his marriage request. Either way, the four-part test announced in *Turner,* and relied upon by the parties, will control.

and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).

While the Court "take[s] the facts in the light most favorable to the [P]laintiff, ... [the Court] need not accept the legal conclusions drawn from the facts," and "need not accept as true unwarranted inferences, unreasonable conclusions or arguments." *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008) (quoting *Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000)). A complaint fails to state a claim when, accepting the plaintiff's well-pleaded allegations as true and drawing all reasonable inferences, the complaint lacks "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A pleading that "offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do" and a complaint will not "suffice if it tenders naked assertions devoid of further factual enhancements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations and citations omitted).

The only relevant difference between a motion under Rule 12(b)(6) and one under Rule 12(c) is that "on a Rule 12(c) motion the court may consider the Answer as well." *Alexander v. City of Greensboro*, No. 1:09–CV–293, 2011 WL 3360644, at *2 (M.D.N.C. August 3, 2011). The "factual allegations in the [A]nswer are taken as true, to the extent they have not been denied or do not conflict with the [C]omplaint." *Farmer v. Wilson Hous. Auth.*, 393 F.Supp.2d 384, 386 (E.D.N.C. 2004) (internal quotations and citations omitted). "[W]hen deciding a 12(c) motion, the court may consider 'the content of the competing pleadings, exhibits thereto, matters incorporated by reference in the pleadings, [and] whatever is central or integral to the claim for relief or defense.'" *Proffitt v. Bristol-Myers Squibb Co., No.* CV 1:17-04391, 2018 WL 3318893, at *2 (S.D.W. Va. July

5, 2018) (quoting *In re Coloplast Corp. Pelvic Support Sys. Prod. Liab. Litig.*, 219 F. Supp. 3d 577, 579 (S.D.W. Va. 2016)).

Plaintiff filed his amended complaint *pro se*, and courts are required to liberally construe *pro se* complaints. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007). However, even under this less stringent standard, the amended complaint still must contain sufficient factual allegations to support a valid legal cause of action. *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003). The Court may not rewrite the pleading to include claims that were never presented, *Parker v. Champion*, 148 F.3d 1219, 1222 (10th Cir. 1998), construct the plaintiff's legal arguments for him, *Small v. Endicott,* 998 F.2d 411, 417-18 (7th Cir. 1993), or "conjure up questions never squarely presented" to the court. *Beaudett v. City of Hampton,* 775 F.2d 1274, 1278 (4th Cir. 1985).

## III.  Discussion

Title 42 U.S.C. § 1983 provides a remedy to parties who are deprived of federally protected civil and constitutional rights by persons acting under color of any state "law, statute, ordinance, regulation, custom, or usage." 42 U.S.C.A. § 1983. Congress enacted § 1983 "to enforce provisions of the Fourteenth Amendment against those who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it." *Monroe v. Pape,* 365 U.S. 167, 171-172 (1961), *overruled on other grounds by* 436 U.S. 658.

In order to state a cause of action under § 1983, a plaintiff must present facts showing that: (1) a person deprived him or her of a federally protected civil right, privilege or immunity and (2) that the person did so under color of State law. *Perrin v. Nicholson*, C/A No. 9:10-1111-HFF-BM, 2010 WL 3893792, at *2 (D.S.C. Sept. 8, 2010); *See American Mfr. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999) ("To state a claim for

relief in an action brought under § 1983, respondents must establish that they were deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law."). If either of these elements is missing, the complaint fails to state a claim for relief under § 1983. *Sullivan*, 526 U.S. at 50.

### A. Factual Issues Requiring Development

As an initial matter, the undersigned agrees with Defendants that limited factual development is not necessary in order for the court to dispose of Defendants' Rule 12(c) motion. Plaintiff complains that his constitutional right of marriage has been illegally violated by Defendants' continued refusal to allow him to marry Ms. Lawrence. The parties agree that Defendants have repeatedly refused Plaintiff's requests to marry Ms. Lawrence, and these refusals have been based on Operating Procedure 5.13. The only disagreement is over the constitutionality of those refusals. Discovery has not yet been conducted; therefore, factual development will likely be necessary to determine the merits of Plaintiff's claim. Nevertheless, the pleadings are sufficient to resolve the issues raised in Defendants' motion.

### B. Plaintiff's Constitutional Claim

The Supreme Court has established that prisoners retain a constitutional right to marry. *See Turner*, 482 U.S. at 95-96 (1987) (citing *Zablocki v. Redhail*, 434 U.S. 374 (1978) and *Loving v. Virginia*, 388 U.S. 1, 12 (1967)). However, the "right to marry, like many other rights, is subject to substantial restrictions as a result of incarceration." *Turner*, 482 U.S. at 95. In *Turner,* the Supreme Court held that "when a prison regulation impinges on inmates' constitutional rights," the correct test of the validity of such an infringement is not the heightened scrutiny standard employed in normal circumstances,

11

but instead to ask if the regulation is "reasonably related to legitimate penological interests." *Id.* at 89. The *Turner* Court established a four-part test to determine whether a prison regulation is indeed reasonably related to a legitimate penological interest. That test asks: "(1) whether there is a 'valid, rational connection' between the prison regulation or action and the interest asserted by the government, or whether this interest is 'so remote as to render the policy arbitrary or irrational'; (2) whether 'alternative means of exercising the right ... remain open to prison inmates'; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any 'obvious, easy alternatives' to the challenged regulation or action." *Wall v. Wade*, 741 F.3d 492, 499 (4th Cir. 2014) (citing *Turner,* 482 U.S. at 89–92).[3]

Defendants first contend that Plaintiff is not actually asserting the infringement of a constitutionally protected right. (ECF No. 30 at 8). Defendants argue that as marriage by telephone or proxy is not permitted under West Virginia law, Plaintiff's request for marriage necessarily requires visitation. (*Id.* at 6, 8). Thus, what Plaintiff is truly asserting is an infringement of his visitation rights and not violations of his right to marry under the First and Fourteenth Amendments. (*Id.* at 8). Because inmates have no general right

---

[3] Defendants argue that the Supreme Court's decision in *Butler v. Wilson,* 415 U.S. 953 (1974) reduces Plaintiff's complaint to a *de minimus* claim. In essence, they assert that because Plaintiff is serving a life sentence, his constitutional right to marry is worth less than the right to marry guaranteed to other inmates. In *Butler,* the Supreme Court summarily affirmed a lower court judgment that upheld a New York "civil death" statute prohibiting inmates with life sentences from marrying. The lower court rejected various arguments that the statute violated the inmates' constitutional rights, noting that most aspects of marriage—cohabitation, sexual intercourse, begetting and raising children—were unavailable to the inmates anyway. While this observation may be true, the undersigned does not find Defendants' argument particularly useful in analyzing a Rule 12(c) motion. Furthermore, the Supreme Court did not articulate in *Turner* the effect that a life sentence, alone, has on the right to marry. When addressing the consistency of *Turner* with *Butler,* the Supreme Court merely distinguished *Butler,* largely on the basis that in *Butler,* the Court was reviewing a lower court decision on the constitutionality of a state statute that denied the marriage right as part of the punishment for an inmate's crime, not the constitutionality of the marriage right itself. *Turner,* 482 U.S. at 96.

to visitation, Defendants maintain, Plaintiff certainly has no right to the *special* visitation required for a wedding ceremony. (*Id.* at 8-9).

It is true that inmates do not generally enjoy a constitutional right to visitation. *See Gerber v. Hickman*, 291 F.3d 617, 621-22 (9th Cir. 2002) ("It is well-settled that prisoners have no constitutional right while incarcerated to contact visits or conjugal visits."); *see also Goodwin v. Turner*, 908 F.2d 1395, 1399 (8th Cir. 1990) ("By its very nature, incarceration necessarily affects the prisoner's family."); *Hernandez v. Coughlin*, 18 F.3d 133, 137 (2d Cir. 1994) ("[R]ights of marital privacy, like the right to marry and procreate, are necessarily and substantially abridged in a prison setting."); *Bazzetta v. McGinnis*, 430 F.3d 795, 804 (6th Cir. 2005) (finding that there is no "implicit due process right to prison visitation."); *Kentucky Dep't of Corrs. v. Thompson*, 490 U.S. 454, 460 (1989) (no due process right to unfettered visitation); *Block v. Rutherford*, 468 U.S. 576, 585–88, (1984) (pretrial detainees have no constitutional due process right to contact visits); *Saleem v. Helman*, 124 F.3d 205, 205 (7th Cir. 1997) (no constitutional right to conjugal visits); *McKnight v. Johnson*, 277 F.3d 1373 (5th Cir. 2001) (holding that it is often constitutionally permissible to forbid visitation between husband and wife in the prison setting). However, Plaintiff is not asserting a right to visitation with Ms. Lawrence, he is asserting his constitutional right to *marry* her. Despite Defendants' arguments to the contrary, the fact that Plaintiff's asserted right will probably require some form of visitation does not have the effect of substantively transforming the right he is claiming. Although Plaintiff likely will need to sign his name to a marriage certificate in order to complete the process of getting married, Defendants surely would not argue that what Plaintiff is actually asserting is the right to be given a pen. Thus, Plaintiff's claim is properly considered as asserting a violation of his fundamental right to marry, and the

validity of Defendants' restriction of that right should be considered under the test established in *Turner*.

Defendants next argue that even if Plaintiff is alleging a violation of his constitutional right to marry, their decision to deny Plaintiff's marriage request pursuant to the WVDOC policies and procedures is so clearly constitutional under the four-factor *Turner* test that they are entitled to judgment on the pleadings. (ECF No. 24 at 10). They assert, under the first inquiry, that there is a clear valid, rational connection between the prison regulation or action and a penological interest. (*Id.* at 7). Defendants contend that pursuant to institutional procedures, they determined the marriage between Ms. Lawrence and Plaintiff would impose a security risk on the facility due to Ms. Lawrence's status as a former employee. (*Id.* at 7). Defendants also maintain that the security threat might "potentially be cumulative" because, although each decision is discretionary, giving visiting privileges to a former employee who broke the rules would "have an effect on the entire West Virginia prison system" as Defendants would be "hard-pressed" to deny any subsequent prison visitations after allowing such a flagrant violator to be admitted. (ECF No. 30 at 7-8).

With respect to the second *Turner* inquiry—whether there are alternative means to exercise the right—Defendants claim that this concern is satisfied because Plaintiff is free to marry any individual who meets the clearly defined and relatively inclusive criteria for inmate marriage. Given that many individuals can qualify for visitation and be eligible for marriage, Defendants argue that Plaintiff undoubtedly has alternatives available to him. (ECF No. 24 at 7-8). Under the third inquiry, Defendants maintain that allowing Plaintiff to marry Ms. Lawrence would have a deleterious effect on the guards, other inmates, and prison resources. (*Id.* at 8). According to Defendants, Ms. Lawrence's

14

knowledge of security protocols and demonstrated past willingness to flout prison polices for Plaintiff's benefit substantially increases the risk that she would engage in future violations on Plaintiff's behalf. (*Id.*). Consequently, the prison would need to expend significant resources in monitoring Ms. Lawrence to ensure that she did not violate security procedures or disclose security protocols to Plaintiff. (*Id.* at 9).

Under the final inquiry, Defendants concede that "Plaintiff does not have an alternative that would permit him to marry Ms. Lawrence and allow her to visit," but again point out that he is able to marry any other person, besides Ms. Lawrence, who does not pose a risk to the institution. (ECF No. 24 at 9). Defendants ask this Court to dismiss Plaintiff's Complaint for failure to state a claim as they have established that their actions are constitutional under the *Turner* test. Accordingly, they argue, there is no violation of Plaintiff's constitutional rights. (*Id.* at 10).

After considering Defendants' arguments, and viewing the facts in the light most favorable to Plaintiff, the undersigned **FINDS,** for the following reasons, that the complaint states enough facts to withstand Defendants' motion for judgment on the pleadings, at least in part. The first inquiry under *Turner* asks whether there is a valid rational relationship between the contested regulation or action and the interest asserted by the prison. 482 U.S. at 89–90. This first inquiry is actually more of an "element" than a factor in the sense that it "is not simply a consideration to be weighed but rather an essential requirement." *Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir. 2006); *see also Sutton v. Rasheed*, 323 F.3d 236, 253 (3d Cir. 2003) ("The first factor is foremost in the sense that a rational connection is a threshold requirement....")(quotation omitted); *Prison Legal News v. Cook*, 238 F.3d 1145, 1151 (9th Cir. 2001) (the first, rational relationship inquiry is a *sine qua non* for establishing that the regulation or decision in

question meets the *Turner* standard); *Boles v. Neet*, 486 F.3d 1177, 1181 (10th Cir. 2007) ("To satisfy the first *Turner* factor, 'the prison administration is required to make a minimal showing that a rational relationship exists between its policy and stated goals.'") (quotation omitted); *Lovelace v. Lee*, 472 F.3d 174, 200 n.9 (4th Cir. 2006) ("*Turner* at a minimum requires a deferential examination of the prison's rationale for the restrictions").

At this stage in the litigation, Defendants fail to show that there is a valid rational connection between their decision to prohibit Plaintiff from marrying Ms. Lawrence and the asserted security interest in a manner sufficient to entitle them to judgment as a matter of law. Defendants' position is that there is a valid, rational nexus between the restriction and a legitimate penological interest because the proposed marriage would create a security risk due to Ms. Lawrence's status as a former employee. (ECF No. 24 at 7). The validity of these security concerns is contested by Plaintiff, who asserts that they represent an "exaggerated response" by the prison and disputes at length the notion that Ms. Lawrence poses a security risk. (ECF No. 28 at 11-13). In considering a motion for dismissal under Rule 12(c) all factual disputes should be resolved in favor of the non-moving party. *Burbach*, 278 F.3d at 405–06. The extent to which Ms. Lawrence's marriage to Plaintiff would create a security risk is a question of fact and not a purely legal conclusion. *Giarratano*, 521 F.3d at 302. Therefore, Defendants are presently unable to establish the rational relationship prong of the *Turner* test as such a finding would require resolving a factual dispute in favor of Defendants. *Presley*, 464 F.3d at 483.

Defendants' position that they are entitled to judgment on the pleadings under the first *Turner* prong is further undermined by the fact that the valid security interest they identify is premised almost exclusively on the risk that Ms. Lawrence's *visitation* would

pose to the facility, not on the risk that Plaintiff's requested marriage would create. (ECF No. 24 at 7). It appears from the record that Plaintiff and Ms. Lawrence already communicate frequently via mail and telephone. (ECF No. 1 at 9). This apparently has not posed a significant security risk and is permitted by the facility. As explained above, Plaintiff's marriage to Ms. Lawrence would not entitle him to extended visitation rights. Therefore, the alleged increased risk that Ms. Lawrence would disclose security protocols or seek to use her knowledge of them to violate prison rules for Plaintiff's benefit during one supervised marriage visitation has not been demonstrated.

While courts have frequently found policies that prevent former employees such as Ms. Lawrence from *visiting* inmates with whom they have improperly fraternized are rationally related to valid penological interests, none have found that such a justification extends to entirely forbidding marriage between such individuals. *See, e.g., Wolford*, 38 38 F. Supp. 2d 452, 461 (W.D. Va. 1999) (finding that policy would not be justified if it had the actual effect of preventing marriage); *Rasulallah v. Norris*, 2006 WL 932320 (E.D. Ark. 2006) (unpublished) (finding that prison anti-fraternization policy which temporarily forbid marriage between former employee and inmate was constitutional where it merely resulted in a delay of the marriage); *Dixon v. Vannoy*, 674 Fed. Appx. 428 (5th Cir. 2017) (unpublished) (decision to not allow former employee who was prisoner's fiancé to visit was reasonable and plaintiff's argument that defendants had violated his fundamental right to marry was premature as the plaintiff had never formally applied for marriage).

In *Riker v. Lemmon,* 798 F.3d 546 (7th Cir. 2015), the United States Court of Appeals for the Seventh Circuit considered the application of *Turner* in a very similar factual scenario. In *Riker,* a former prison employee was fired due to violating prison rules

by becoming romantically involved with an inmate. *Id.* at 548. She was later denied permission to visit the inmate, pursuant to prison policy, due to her past rule violation with the inmate and status as a former employee. She then applied for authorization to marry the inmate and was denied due to a prison policy which required marriage applicants to be on the inmate's approved visitor list. *Id.* at 549. As justification for the refusal, the prison maintained that the marriage posed security risks because the plaintiff had already demonstrated her willingness to violate departmental rules, was privy to security protocols and procedures, and was likely to disclose that information to the inmate, or "assist him in other inappropriate ways" if they were married. *Riker*, 798 F.3d at 550.

On appeal of a district court's summary judgment in favor of the prison, the Seventh Circuit held that the prison did not establish that its decision was reasonably related to legitimate penological interests. *Id.* at 558. The Seventh Circuit believed that "[t]he fundamental infirmity with the Department's position is that it equates [plaintiff's] one-time request to enter the prison to participate in a marriage ceremony with a request for general visitation rights." *Id.* at 556. The Seventh Circuit concluded that because the record did not show why the prison would be unable to monitor a single special visit for the purposes of a marriage ceremony, summary judgment was inappropriate. *Id.* at 558. As in the Seventh Circuit, other lower courts have been skeptical of prison decisions that deny inmates the right to marry due to visitation concerns. *See Aliviado v. Kimoto*, No. CIV. 12-00259 SOM, 2012 WL 3202222, at *2-4 (D. Haw. Aug. 2, 2012.) (granting a preliminary injunction on the merits as allowing plaintiffs to get married would do nothing to increase the likelihood of security risks identified by the prison); *see also Eads v. Tennessee*, No. 1:18-CV-00042, 2018 WL 4283030, at *13 (M.D. Tenn. Sept. 7, 2018)

(finding that where plaintiff's placement in the SHU would prevent him from marrying his fiancé indefinitely, the plaintiff stated a colorable due process right to marry claim sufficient to survive an initial screening and "the legitimacy and sufficiency of the cited security concerns must be tested by the adversarial process"); *Zastrow v. Pollard*, No. 11-C-371, 2013 WL 1288040, at *6 (E.D. Wis. Mar. 26, 2013) (denying motion for summary judgment where "it is impossible to determine whether the outright denial of [plaintiff's] marriage request was an exaggerated response by prison officials or a decision reasonably justified by legitimate penological concerns."); *Post v. Mohr*, No. 1:11 CV 1533, 2012 WL 76894, at *10 (N.D. Ohio Jan. 10, 2012) (dismissed case as premature but noted, "[i]t is possible for arrangements to be made to accommodate the marriage ceremony, without permanent reinstatement of her visitation privileges.").

Plaintiff himself has suggested that Defendants simply allow a one-time special visit to the facility, specifically for the purpose of getting married, which he contends would be under strict security measures in the normal course of events. (ECF No. 28 at 14). Defendants simply have not articulated why a one-time supervised visit would impose a heavy burden on the prison or that they would be unable to monitor Ms. Lawrence during that time.

In their Reply to Plaintiff's Response in Opposition, Defendants do point to a penological interest that is neither specifically disputed by Plaintiff, nor only present if general visiting rights are granted. (ECF No. 30 at 7-8). Defendants argue that permitting a former employee who violated prison rules special visitation access would leave them unable to later deny any special visitation rights at other facilities, regardless of the risk posed. (*Id.*). This argument is severely undermined, however, by Defendants' later assertion that Plaintiff's allegations regarding other rule violators who were granted

visitation rights is irrelevant to this case as every visitation "decision is unique, with no bearing on any subsequent decision." (*Id.* at 14). If, as Defendants argue, every decision is unique and has no bearing on subsequent decisions, then it is difficult to see how allowing a one-time visitation for a marriage ceremony would have the negative effects they claim. Perhaps later in the proceedings, Defendants will be able to explain how discretionary visitation decisions are both so *sui generis* that it is entirely irrelevant to the validity of their asserted security concerns whether other individuals who committed infractions and had knowledge of security procedures were granted visitation authorization, and also so precedent-bound that allowing Ms. Lawrence a one-time entrance for a wedding ceremony would render them unable to forbid any future visitations at different facilities, but they have not done so for the purposes of Rule 12(c) here.

Although the undersigned finds that Defendants have not established the "essential" first *Turner* prong and thus judgment on the pleadings is not appropriate, the other *Turner* factors also do not counsel dismissal of Plaintiff's claim at this stage. *Goord*, 467 F.3d at 274. Under the second inquiry, Defendants argue that Plaintiff is free to exercise his right through the alternative means of selecting someone who does meet the security criteria. (ECF No. 24 at 7-8). However, the right to marry does not operate only in the abstract, but includes the right to select one's spouse. *See e.g. Obergefell v. Hodges*, 135 S. Ct. 2584, 2599 (2015) ("the right to personal choice regarding marriage is inherent in the concept of individual autonomy"); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 620 (1984) ("[T]he Constitution undoubtedly imposes constraints on the State's power to control the selection of one's spouse...."); *Loving v. Virginia*, 388 U.S. 1, 12 (1967); *Riker*, 798 F.3d at 555 (argument that burden on right was minimal as plaintiff was still free to

marry anyone but the inmate could "be dismissed quickly"). Here, Plaintiff is not able to marry Ms. Lawrence due to the actions of Defendants. The fact that he can marry other individuals does not represent a valid alternative means of exercising the right he asserts.

Defendants argue that under the third *Turner* factor, they would be forced to "deploy considerable resources" to monitor Ms. Lawrence and ensure that she does not "disclose security procedures to inmates, provide contraband to the Plaintiff, or otherwise assist him (or other inmates) in violation of policies and procedures." (ECF No. 24 at 9). This, however, again assumes either that Plaintiff is requesting, or that Ms. Lawrence would necessarily be given, general visitation rights. Since the level of contact that Plaintiff and Ms. Lawrence would be entitled to under the constitution would not increase due to their marriage, the increased burdens identified by Defendants that would result from the need to monitor the two during visitation do not apply.

Finally, the fourth *Turner* inquiry asks whether there exist any obvious, easy alternatives to the challenged action. Defendants seem to believe that this inquiry considers whether the *plaintiff* has any easy or obvious alternative available to him, (ECF No. 24 at 9), however, it actually asks whether the prison had an alternative means of achieving its stated goals without burdening the plaintiff's asserted right. *See e.g. Wall*, 741 F.3d at 501. Plaintiff asserts that his request could be accommodated by either permitting his marriage to proceed by proxy, or by allowing Ms. Lawrence a special dispensation for the purposes of a marriage ceremony. (ECF No. 28 at 14). Defendants correctly note that Plaintiff is incorrect in stating that an alternative option would be for the marriage ceremony to be conducted by proxy, as this is not permitted in the State of West Virginia as a matter of law. *See* W. Va. Code Ann. § 48-2-105; 55 C.J.S. Marriage § 34. However, whether a special visitation would present the prison with an alternative

means of achieving their stated goals is a factual question that is in dispute between the parties. Thus, the fourth inquiry also does not weigh in favor of Defendants' motion for judgment at this time.

Therefore, with all contested facts resolved in his favor, Plaintiff states a claim that is able to survive a motion for judgment on the pleadings. He asserts that he was denied the right to marry by prison officials, and that this denial did not comply with the standard required by federal case law. Plaintiff alleges enough facts to make this claim "plausible on its face." *Twombly*, 550 U.S. at 570. Namely, Plaintiff alleges that the interest asserted by Defendants is illegitimate, and that, in any event, the interest could be accommodated without sacrificing the stated goals of the Defendants. (ECF No. 28 at 15).

However, this does not mean Plaintiff will ultimately be successful on the merits. Further factual development will be necessary to determine whether, as Plaintiff contends, Plaintiff and Ms. Lawrence's marriage does not pose any threat to the security of MOCC. To this end, discovery will likely be needed to test the sufficiency of Defendants' stated penological interest; such as, the type of security procedures to which Ms. Lawrence had access, whether the security procedures have changed in the years since Ms. Lawrence last worked at MOCC, and how specifically the proposed marriage ceremony would increase the risk of disclosure of those security procedures. If Plaintiff believes that a former volunteer who had access to similar security procedures as Ms. Lawrence was allowed to return to the facility, he may discover information regarding that situation as well. Finally, Plaintiff should make clear whether he is challenging the Defendants' actions as applied specifically to him, or the facial constitutionality of the WVDOC policies governing inmate marriage generally.

### C. Qualified Immunity

Defendants additionally argue that they are entitled to qualified immunity in this action because Plaintiff failed to articulate any facts demonstrating that they engaged in conduct which violated Plaintiff's clearly established rights. (ECF No. 23 at 1). Government officials performing discretionary functions may be protected from monetary damages under the doctrine of qualified immunity when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Qualified immunity "is a judicially created doctrine that stems from the conclusion that few individuals will enter public service if such service entails the risk of personal liability for one's official decisions." *Donovan v. City of Milwaukee,* 17 F.3d 944, 947 (7th Cir. 1994). This doctrine protects law enforcement officers in the exercise of their official duties from the risk of personal liability for making "bad guesses in gray areas," ensuring that they are only responsible for "transgressing bright lines." *Marciariello v. Sumner,* 973 F.2d 295, 298 (4th Cir. 1992). As the United States Supreme Court explained in *Pearson v. Callahan:*

> "Qualified immunity balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."

*Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (quoting *Groh v. Ramirez,* 540 U.S. 551, 567 (2004)). Because qualified immunity is "an immunity from suit rather than a mere defense to liability," it is "effectively lost if a case is erroneously permitted to go to trial." *Id.* (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985)). "Where the defendant seeks

qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." *Saucier v. Katz,* 533 U.S. 194, 200 (2001).

In determining the applicability of qualified immunity, the court must consider two questions: (1) whether a constitutional or statutory right would have been violated on the facts alleged by plaintiff, and (2) whether the right asserted was clearly established at the time of the alleged violation. *Pearson,* 555 U.S. at 232. These questions may be answered in any order that "[would] best facilitate a fair and efficient disposition of each case." *Id.* at 242. If a court finds that a claimed constitutional right was not clearly established at the time of the alleged wrongdoing, the court may dispose of the case without engaging in the pointless exercise of determining whether the facts alleged actually establish a violation of that right. *Id.* Similarly, if a court determines that the facts alleged by the plaintiff do not support a reasonable inference that a constitutional right was violated, the analysis terminates, and the complaint is subject to dismissal for failure to state a claim.

"[A] defendant can raise the qualified-immunity defense at both the motion to dismiss and summary judgment stage." *Raub v. Bowen*, 960 F. Supp. 2d 602, 608 n.8 (E.D. Va. 2013) (citing *Tobey v. Jones,* 706 F.3d 379, 393–94 (4th Cir. 2013). "So long as qualified immunity does not turn on *disputed facts,* 'whether the officer's actions were reasonable is a question of pure law.'" *Id.* (citing *Henry v. Purnell,* 652 F.3d 524, 531 (4th Cir. 2011) (*en banc* )). However, in many cases, "immunity is peculiarly well-suited for resolution at the summary judgment stage." *Id.* (citing *Willingham v. Crooke,* 412 F.3d 553, 558–59 (4th Cir. 2005)). As qualified immunity is designed to shield officials "not only from liability but from the burdens of litigation, its establishment at the pleading or

summary judgment stage has been specifically encouraged." *Pritchett v. Alford*, 973 F.2d 307, 313 (4th Cir.1992).

To be clearly established, a right must be sufficiently clear "that every 'reasonable official would [have understood] that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* "Indeed, a rejection of qualified immunity requires that in the light of pre-existing law the unlawfulness [of a defendant's actions] must be apparent." *Williams v. Ozmint*, 716 F.3d 801, 808 (4th Cir. 2013) (internal citations and quotations omitted).

"The defense of qualified immunity has no bearing, however, on claims for prospective court action such as injunctive relief." *Id. see also Rowley v. McMillan*, 502 F.2d 1326, 1331 (4th Cir.1974); *Sudler v. City of New York*, 689 F.3d 159, 177 (2d Cir.2012). Here, Plaintiff is seeking such prospective court action. He asks this Court to issue a declaratory judgment stating that Defendants violated Plaintiff's rights under the First and Fourteenth Amendments by refusing his requests to marry, and to issue an injunction ordering Defendants to permit his marriage with Ms. Lawrence. (ECF No. 1 at 17). Therefore, to the extent that Defendants seek dismissal of Plaintiff's claims for equitable relief on the ground of qualified immunity, the undersigned **FINDS** Defendants' motion to be without merit. While Plaintiff primarily requests prospective relief not covered by the doctrine of qualified immunity, he also asks for an award of "compensatory and punitive damages in amounts deemed fit and proper by the Court." (*Id.*). Thus, to the extent that Plaintiff seeks monetary damages from Defendants, they are entitled to raise the defense of qualified immunity.

The only court in the Fourth Circuit to have considered a similar issue as the one presented here is the Western District of Virginia. *Wolford*, 38 F. Supp. 2d at 454. In *Wolford*, a former prison employee sued her employer alleging that her fundamental right to marry under the Fourteenth Amendment was violated after she was fired for breaking an anti-fraternization rule by marrying a prison inmate. The District Court dismissed the plaintiff's claim that her fundamental right to marry was violated, noting that the rule was a reasonable public safety measure. Crucially, the Court noted the plaintiff was not actually foreclosed from marrying the inmate; indeed, they did successfully marry. The plaintiff merely had to choose between keeping her job or marrying the inmate. *Id.* at 461. The District Court stated, "[w]ere [plaintiff's] employment opportunities completely foreclosed by the rule in question or had Defendants' regulations imposed absolute restrictions on the right to marry so that the plaintiff was truly deterred, the result here would be different." *Id.* at 462.

The parties do not reference, and the undersigned did not find, another case decided in this Circuit, or in the Supreme Court, that was sufficiently similar to the present case that arguably would have placed Defendants on notice that their actions in denying Plaintiff's request to marry a former prison employee violated a clearly established right. *See Mullenix v. Luna,* 136 S. Ct. 305, 311 (2015) (warning courts "not to define clearly established law at a high level of generality") (internal quotation omitted). Indeed, courts have frequently upheld restrictions on interactions between former correctional facility employees and inmates. While no court has held that such restrictions justify invalidating an individual's fundamental right to marry, the boundaries of these restrictions have not been clearly delineated by the courts in this Circuit, nor has there been a consensus among all circuits. Consequently, although Plaintiff alleges enough facts

26

to state a claim for relief capable of surviving the standard of Rule 12(c), he does not show that it is "beyond debate" the Defendants violated his constitutional right in refusing to allow Plaintiff and Ms. Lawrence to marry pursuant to WVDOC policies and procedures. *al-Kidd*, 563 U.S. 731, 741.

Accordingly, Defendants' Motion for Judgment on the Pleadings should be **GRANTED** as to Plaintiff's claim for monetary damages against Defendants pursuant to the defense of qualified immunity.

## IV.   Proposal and Recommendations

For the reasons stated, the undersigned respectfully **PROPOSES** that the presiding District Judge confirm and accept the above findings and respectfully **RECOMMENDS** that Defendants' motion for judgment on the pleadings, (ECF No. 23), be **GRANTED,** in part, and **DENIED**, in part. The motions for judgment on the pleading should be **DENIED** as to Plaintiff's claims for equitable relief and **GRANTED** as to Plaintiff's claims for monetary damages.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Joseph R. Goodwin, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to Judge Goodwin, Magistrate Judge Eifert, counsel of record, and any unrepresented party.

The Clerk is instructed to provide a copy of this "Proposed Findings and Recommendations" to Plaintiff, counsel of record, and any unrepresented parties.

**FILED:**  November 9, 2018

Cheryl A. Eifert
United States Magistrate Judge

28